UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| UNITED STATES OF AMERICA | Plaintiff |
|---|---|
| v. | Criminal Action No. 3:18-cr-00056-RGJ |
| JOSEPH A. WILLIAMS | Defendant |

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Joseph Williams's Motion to Suppress Evidence. [DE 17]. The Court held a suppression hearing. [DE 23]. Briefing is complete, and the motion is ripe. [*See* DE 20; DE 29; DE 32]. For the reasons below, the Court **DENIES** Williams's motion.

## BACKGROUND

On November 23, 2017, Louisville Metro Police Department ("LMPD") Detective McCauley, Sergeant Keeling, and Detective Barton were conducting surveillance on the Georgetown Apartment complex in Louisville, an area with a history narcotics trafficking. [DE 24, Tr. Supp. Hearing at 106:21–25, 107:1–15]. Detective McCauley observed a vehicle idling in the vicinity of the apartment complex. [*Id.* at 107:3–24]. The vehicle left the apartment complex, turned without signaling, and passed Detective McCauley's unmarked vehicle. [*Id.* at 107:17–21]. Detective McCauley recognized the driver as Williams, whom Detective McCauley knew from an earlier traffic stop. [*Id.* at 105:11–17]. Detective McCauley communicated over police radio that the vehicle had turned without signaling. [*Id.* at 108:5–9].

Around the corner from the apartment complex, LMPD Detectives Flynn and Mayo stopped Williams's vehicle for failure to signal, excessive windshield tinting, and an obstructed

1

license plate. [*Id.* at 67:6–25, 68:1–14]. After Detectives Flynn and Mayo signaled for Williams to pull over, Williams drove about "the length of a football field" before stopping the vehicle. [*Id.* at 68:18–25]. As Williams stopped, Detective Flynn saw Williams's head "duck down to what appeared to be underneath the driver's seat." [*Id.* at 69:4–8].

Detectives Flynn and Mayo approached the vehicle, and Detective Flynn saw Williams still reaching under the driver's seat. [*Id.* at 69:10–19]. Detective Flynn shined his flashlight through the windshield and saw what "looked to be the butt end of a pistol" under the driver's seat. [*Id.*]. Detective Flynn signaled to Detective Mayo, who was approaching the driver's side door to speak with Williams, that a firearm was likely in the vehicle. [*Id.* at 95:9–17]. Williams then lifted his arms from beneath the seat, and Detective Mayo secured Williams's arms and removed him from the vehicle. [*Id.* at 98:17–23]. As Detective Mayo removed Williams from the vehicle, Williams's hands moved toward his waistband. [*Id.* at 75:19–22]. The officers told Williams to remain still and handcuffed him. [*Id.* at 76:3–5]. Detective Flynn testified that they removed and handcuffed Williams because the "totality of the circumstances," including Williams's "furtive movements" and the likely firearm, created a concern for officer safety. [*Id.* at 99:3–15].

Detective McCauley arrived to assist with the traffic stop. [*Id.* at 108:24–25, 109:1–6]. He approached the open driver's side door and saw the back of the firearm in Williams's vehicle. [*Id.* at 109:8–15]. Detective McCauley testified that seeing Williams and the handgun was significant because he "knew" Williams was "a convicted felon and known violent offender." [*Id.* at 109:18–21]. Detective McCauley announced a code to the other officers signifying the presence of the firearm. [*Id.* at 109:22–25, 110:1–6]. Because Williams was a felon and possessed a gun, Detective McCauley considered Williams under arrest. [*Id.* at 109:20–21]. That said, the officers did not inform Williams that he was under arrest at that time. [*Id.* at 120:19–22].

2

After the officers removed Williams from the vehicle, Sergeant Keeling patted Williams down and found a stack of currency in Williams's pocket and a bag of hydrocodone in Williams's underwear. [*Id.* at 114:2–24]. The officers then searched Williams's vehicle but found no additional contraband. [*Id.* at 122:2–10]. During the search, Williams made several incriminating statements, including "that's all I had was the gun" and that the hydrocodone was for personal use and "not trafficking." [*Id.* at 122:2–6, 125:1–2]. Detective McCauley then transported Williams to the Louisville Metro Department of Corrections. [*Id.* at 125:9–12].

A grand jury charged Williams with drug and firearm offenses. [DE 1]. Williams now moves to suppress evidence discovered during the stop and search of his vehicle. [DE 17]. The Court held a suppression hearing [DE 23], and the parties filed post-hearing briefs [DE 29; DE 32].

## DISCUSSION

Williams makes several arguments in favor of suppression. First, Williams argues that the LMPD lacked probable cause to conduct the initial stop. [DE 29 at 162–65]. Second, Williams contends that the stop violated his right to due process because the LMPD was targeting poor and minority communities when conducting stops. [*Id.* at 165–66]. Third, Williams argues that the LMPD lacked probable cause to search his vehicle. [*Id.* at 166–69]. Finally, Williams asserts that the Court should suppress his incriminating statements because the officers' actions amounted to a custodial interrogation without a *Miranda* warning. [*Id.* at 169].

**A.    The Stop of Williams's Vehicle was Proper.**

First, Williams asserts that the LMPD improperly stopped his vehicle. [DE 17 at 38–39; DE 29 at 162–65]. Police officers can lawfully stop a vehicle if there is probable cause to believe that the driver committed a traffic violation. *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.

3

1993). And a stop based on a traffic violation is permissible even if it is pretext for further investigation. *Whren v. United States*, 517 U.S. 806, 813 (1996). An officer's actual motivation for making the stop is irrelevant to the constitutionality of the stop when the officer has probable cause to make the stop. *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002). In other words, if a stop is supported by probable cause, "it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." *Ferguson*, 8 F.3d at 391.

Detectives Flynn and Mayo saw Williams's vehicle, among other things, take a right-hand turn without using a turn signal. [DE 24, Tr. Supp. Hearing at 67:18–25, 68:1]. Changing lanes without signaling violates Kentucky law. Ky. Rev. Stat. § 189.380. The detectives thus had probable cause to stop Williams's vehicle. And because the stop was supported by probable cause, the stop was proper even if pretextual. *Whren*, 517 U.S. at 813.[1]

## B. The Stop Did Not Violate Williams's Due Process Rights.

Next, Williams argues that the pretextual stop violated his right to due process under the Fourth Amendment. He "asserts that the random traffic stops concentrated in 'high crime areas' is a self fulfilling prophecy [sic] that targets poor and minority communities." [DE 29 at 165–66]. According to Williams, "[s]hould the this Ninth Mobile Division choose to pull over every car in Prospect, or St. Matthews, that commits the most minor of traffic infractions, pull the occupants out of the vehicle, handcuff the occupant, and then search the car, these areas would surely statistically turn into 'high crime areas' overnight, and thus require even more of this type 'policing'." [*Id.* at 166].

---

[1] Williams questions "the efficacy, morality, and legality" of pretextual traffic stops but acknowledges that "pretextual traffic stops are currently permitted by law, regardless of the subjective intent of the officer." [DE 29 at 162–63]. Williams questions the detectives' credibility by noting that there is no body-camera footage during the signaling violation and the detectives cited only one of Williams's signaling violations rather than two. [*Id.* at 164–65]. This lack of information, even if relevant, does not call into doubt the veracity of Detective Flynn's credible testimony about a signaling violation.

To begin with, there is no Fourth Amendment right to due process. The Fifth and Fourteenth Amendments to the United States Constitution guarantee due process. *See* U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law. . . ."); U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."). Courts have held that, as part of the totality-of-the-circumstances test to determine whether there is reasonable suspicion, law enforcement may consider whether the stop is in a high-crime area. *See United States v. Smith*, 594 F.3d 530, 541 (6th Cir. 2010) (citing *United States v. Caruthers*, 458 F.3d 459, 465 (6th Cir. 2006), *abrogation on other grounds recognized by Slusser v. United States*, 895 F.3d 437, 439 (6th Cir. 2018)).

The officers here did not remove Williams from his vehicle, handcuff him, and search his vehicle only because he committed a minor traffic infraction in a high-crime area. Instead, during the routine traffic stop, the officers noted a firearm directly below Williams's seat and found narcotics during the subsequent pat down of Williams's body. [DE 24 at 69:10–19, 114:2–24]. Given this context, the fact the stop occurred in an area known for narcotics trafficking does not create a due process violation.

**C.  The Warrantless Search of Williams's Vehicle Was Permissible.**

Williams also asserts that the warrantless search of his vehicle was improper. [DE 29 at 166–69]. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (citations omitted). The United States argues that both the automobile exception and the search-incident-to-detention exception apply. [DE 32 at 181].

The search of Williams's vehicle was permissible under either exception. First, the automobile exception allows an officer to search a vehicle without a search warrant if he

has probable cause to believe that evidence of criminal activity or contraband is in the vehicle. *California v. Acevedo*, 500 U.S. 565, 569 (1991). Here, the officers' discovery of hydrocodone in Williams's underwear provided probable cause to believe there was contraband in the vehicle. *See United States v. Johnson*, 383 F.3d 538, 545–46 (7th Cir. 2004); *United States v. Lumpkin*, 159 F.3d 983, 988 (6th Cir. 1998) (citing *United States v. Lewis*, 3 F.3d 252, 254 (8th Cir. 1993)); *United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994); *United States v. Pendelton*, No. 3:15CR-00116-CRS, 2017 WL 2727099, at *13 (W.D. Ky. Mar. 16, 2017), *report and recommendation adopted*, No. 3:15-CR-00116-CRS, 2017 WL 2722305 (W.D. Ky. June 23, 2017).

Second, the search-incident-to-detention exception permits officers to perform a protective search where the officer "possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). A search may be proper even if, as here, a detainee is handcuffed during a protective search because the detainee may be able to "break away from police control and retrieve a weapon from his automobile." *Id.* at 1051 (citations omitted); *see also United States v. McCraney*, 674 F.3d 614, 620 (6th Cir. 2012); *United States v. Davis*, 341 F. App'x 139, 141 (6th Cir. 2009); *cf. Arizona v. Gant*, 556 U.S. 332 (2009) (no reasonable belief of danger when the detainee was restrained in the back seat of a squad car). "Whether such reasonable suspicion of danger existed . . . is determined from examination of the individual factors under the totality of the circumstances." *McCraney*, 674 F.3d at 620 (citing *United States v. Shank*, 543 F.3d 309, 314 (6th Cir. 2008); *United States v. Graham*, 483 F.3d 431, 438 (6th Cir. 2007); *Caruthers*, 458 F.3d at 464).

The circumstances here show that the officers' suspicion of danger was reasonable. As noted, Williams drove "the length of a football field" before stopping his vehicle after the officers first commanded him to pull over. [DE 24 at 68:18–25]. Then, as Williams stopped and the officers approached the vehicle, Detective Flynn saw Williams's head "duck down to what appeared to be underneath the driver's seat." [*Id.* at 69:4–8]. Detective Flynn saw a pistol under the seat where Williams was reaching, and Williams reached for his waistband when the officers removed him from the vehicle. [*Id.* at 69:10–19, 75:19–22]. Given the totality of these circumstances, including William's location near the vehicle's trunk, the officers were justified in their reasonable suspicion of danger and a protective search of Williams's vehicle was appropriate. *McCraney*, 674 F.3d at 620.

**D.     Williams's Incriminating Statements Are Admissible.**

Finally, Williams argues that the Court should suppress incriminating statements he made during the search of his vehicle. [DE 29 at 169]. He argues that "[w]hile handcuffed, and clearly under arrest, the police engage[d] in conversation with [him] regarding the preceding events," and that "[t]he ongoing questioning, and back and forth discussions about the arrest, which took place over nearly thirty minutes, amounted to a custodial interrogation without being first advised of his" *Miranda* rights. [*Id.*].

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court addressed the problem of how the privilege against compelled self-incrimination guaranteed by the Fifth Amendment could be protected from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation. The Court held that before beginning a custodial interrogation, law enforcement must "demonstrate[] the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. Thus, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as

7

evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* *Miranda* warnings are required, then, only when police interrogate a defendant in custody. Voluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings. *See Edwards v. Arizona*, 451 U.S. 477, 485–86 (1981); *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016) (citation omitted). And "interrogation," as conceptualized in *Miranda*, "must reflect a measure of compulsion above and beyond that inherent in custody itself" and involve "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980); *see also United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). "[T]he term 'interrogation' under *Miranda* refers . . . to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301.

The body-camera footage here shows that Williams made his statements freely and not in response to interrogation. As Detective Barton searched the trunk of Williams's vehicle, Detective Barton noted to the other officers that "there was [only] the gun and the pills." [DE 22, Barton 1 at 9:10]. Williams, who was standing nearby, offered, "that's all I had was the gun." [*Id.*]. Detective Barton then said, "the pills, that's something," to which Williams responded, "just possession, not trafficking." [*Id.*]. Detective Barton would have no reason to believe that this exchange, which merely addressed the findings of his search to nearby officers, was likely to elicit

an incriminating response from Williams. It therefore does not amount to express questioning or its functional equivalent, and suppression would be improper. *See Innis*, 446 U.S. at 300–01 (no express questioning or its equivalent when officers discussed, with the defendant present, their concern that a missing firearm was located near a school for handicapped children); *McKinney v. Hoffner*, 830 F.3d 363, 370–73 (6th Cir. 2016) (reversing the lower court because the eliciting statement did "not rise to the level of the examples cited in *Innis* as the 'functional equivalent' of express questioning—reverse line-ups, positing the guilt of the suspect, and the like.").

## CONCLUSION

For the reasons set forth above, and being otherwise sufficiently advised, **THE COURT HEREBY ORDERS** that Williams's Motion to Suppress [DE 17] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

June 17, 2019

Cc: Counsel of record